IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

NELVING CASTRO

CRIMINAL ACTION
NO.  15-362

MEMORANDUM OPINION

Defendant Nelving Castro, charged with possession with intent to distribute cocaine,

heroin, and methamphetamine under 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C), moves to

suppress evidence police seized when they searched his residence pursuant to a warrant on July

9, 2015, as well as any inculpatory statements that he is alleged to have made.[1]  The Court finds

that the search did not violate the Fourth Amendment because there was a substantial basis to

believe that the affidavit supporting the warrant established probable cause to search Defendant's

residence.  Therefore, Defendant's motion to suppress shall be denied.

I.       BACKGROUND

On July 9, 2015, law enforcement officers searched Defendant's residence at 5016 Saul

Street in Philadelphia.  Gov't's Mem. of Law in Resp. to Def.'s Mot. to Suppress (Gov't's Br.) at

2.  During the search, officers found 558 grams of heroin, 232 grams of pure methamphetamine,

1,112 grams of cocaine, and multiple firearms.  *Id.* at 4.  The search was conducted pursuant to a

warrant issued by a local district justice, based on an affidavit from Pennsylvania Bureau of

Narcotics Investigation and Drug Control (BNI) Agent John Brennan.

---

[1] In his brief and at oral argument, Defendant indicated intent to raise arguments for suppression of inculpatory statements based on *Miranda v. Arizona*, 384 U.S. 436 (1966).  Defendant's *Miranda* arguments have not been briefed, however, and are thus not presently before the Court.  To the extent Defendant intends to seek suppression of evidence based on alleged *Miranda* violations, he should do so in the context of a pre-trial motion consistent with the deadlines established by the Court's Scheduling Order of February 1, 2016.  (ECF No. 38).

According to the affidavit, BNI agents worked with a Confidential Informant ("CI") to carry out a series of controlled purchases of cocaine base (crack cocaine), and one controlled purchase of methamphetamine from Carlos Pena ("Pena") in Philadelphia on June 15, 2015 (crack cocaine only), June 25, 2015 (crack cocaine only), and July 8, 2015 (crack cocaine and methamphetamine).  Aff. of Prob. Cause ¶¶ 8, 25-32.  Prior to collaborating with agents on the controlled purchases, the CI told officers that he/she had purchased controlled substances from "Los" on numerous occasions, and that "Los" always delivered the controlled substances in a late model Dodge Ram pickup truck.  *Id.* ¶ 5.  The CI also indicated that "Los" worked at a tire repair shop near Ridge Avenue and Callowhill Street in Philadelphia, and that "Los" typically transported controlled substances in a Honda Odyssey minivan.  *Id.* ¶¶ 3-4.

According to the affidavit, the first controlled purchase occurred on June 15, 2015.  *Id.* ¶ 7.  On that occasion, the CI received a phone call from "Los" at 5:15 p.m., during which the CI and "Los" negotiated the price of $600 for one-half ounce of crack cocaine.  *Id.*  Approximately 45 minutes later, surveillance officers observed the CI entering a silver Dodge Ram pickup truck at Hunting Park Avenue and Lycoming Street in Philadelphia that was occupied by a male driver.  *Id.* ¶ 11.  Shortly thereafter, the CI exited the Dodge Ram and then met with agents at a predetermined location and turned over clear plastic bag of a substance that field-tested positive for the presence of cocaine.  *Id.*  The affidavit states that a motor vehicle records check revealed that the Dodge Ram observed by officers during the controlled purchase on June 15, 2015, was registered to Carlos A. Pena, of 4540 North "D" Street in Philadelphia.  *Id.* ¶ 14.  Upon being shown a photograph of the driver's license issued to Carlos A. Pena, the CI identified Pena as the person who had delivered the crack cocaine in the Dodge Ram.  *Id.* 13.

The affidavit further states that, on June 22, 2015, surveillance officers observed Pena leaving a tire repair shop near Ridge Avenue and Callowhill Street, entering the same Dodge Ram, driving from the tire repair shop to 3555 Stouton Street, and entering the residence at 3555 Stouton Street with a key.  *Id.* ¶¶ 20-21.  Within an hour, Pena left the residence at 3555 Stouton Street, drove to Frankford Avenue and Buckius Street, picked up an unidentified male passenger, circled the block, and then dropped off the passenger.  *Id.* ¶ 23.  He then returned to the 3555 Stouton Street residence and again entered with a key.  *Id.* ¶ 24.   The affidavit also states that officers observed a Honda Odyssey minivan parked on the 3500 block of Stouton Street that day. *Id.* ¶ 18.  Pennsylvania Bureau of Motor Vehicles checks revealed that both the Dodge Ram and the Honda Odyssey observed by surveillance officers were registered to "Carlos A. Pena" of 4540 "D" Street in Philadelphia.  *Id.* ¶ 15, 18.

According to the affidavit, the second controlled purchase by the CI occurred on June 25, 2015.  *Id.* ¶ 26-34.  On that afternoon, the CI phoned Pena and arranged to purchase 64 grams of crack cocaine for $2,500.  *Id.* ¶25.  The transaction was scheduled to take place at Hunting Park Avenue and Lycoming Street, at approximately 6:00 p.m.  *Id.* ¶ 26.  The affidavit states that surveillance officers observed Pena leave the tire shop at Ridge Avenue and Callowhill Street at approximately 5:00 p.m., and drive directly to 3555 Stouton Street.  *Id.* ¶ 27.  He entered the residence with a key, and was later observed exiting the residence.  *Id.* ¶ 29.  At approximately 6:20 p.m., officers observed Pena traveling west on Hunting Park Avenue in the silver Dodge Ram.  *Id.* ¶ 31.  Pena then stopped, the CI entered the Dodge Ram, the vehicle circled the block, and the CI then exited the vehicle.  *Id.* ¶ 32.  Surveillance officers then followed Pena to the area of 3555 Stouton Street.  *Id.* ¶ 34.  Upon meeting with officers at an undisclosed location, the CI

turned over 64 grams of a substance that field-tested positive for the presence of cocaine.  *Id.* ¶ 32.

The affidavit states that the CI phoned Pena on July 8, 2015, and arranged the purchase of 14 grams of methamphetamine for $800, with the transaction to take place at approximately 6:00 p.m. that evening.  *Id.* ¶ 35.  According to the affidavit, at 6:10 p.m., Police Officer David Clee observed Pena drive to and enter the residence at 3555 Stouton Street.  *Id.* ¶ 36.  At 6:12 p.m., CI phoned Pena, and Pena told CI that he would "front" (*i.e.*, deliver now, and accept payment later) 14 grams of crack cocaine to CI.  *Id.* ¶ 37.  Pena further told CI that he had the crack cocaine in his house, but that he would have to travel to his "source" to obtain the methamphetamine they had discussed earlier.  *Id.*  Pena instructed CI to meet him in the area of the "source," near Frankford High School.  *Id.* ¶ 38.  The affidavit states that CI recalled previously purchasing methamphetamine from Pena in the area of Wakeling and Saul Streets, which is near Frankford High School.  *Id.* ¶ 39.

According to the affidavit, at approximately 6:20 p.m., Officer Clee observed Pena exit the 3555 Stouton Street residence and enter the silver Dodge Ram.  *Id.* ¶ 40.  Officers "then followed Pena to the 5000 block of Saul Street.  Pena parked his vehicle and then walked to the even numbered side of the block and entered a property at approximately 6:36 p.m."  *Id.* ¶ 42.  At 6:56 p.m., officers observed Pena exit the property on Saul Street and again enter the silver Dodge Ram.  *Id.* ¶ 43.  The affidavit states that Pena then "drove directly to Harrison and Wakeling Streets, where the CI entered Pena's vehicle."  *Id.* ¶ 44.  Pena then circled the block several times with the CI in his vehicle and then dropped off the CI at the same location.  *Id.* ¶ 45.  Officers "then followed Pena to Wakeling and Saul Streets.  [Police Officer Marilyn] Brown observed Pena park his vehicle and then knock on the front door of 5016 Saul Street."  *Id.* ¶ 48.

A then-unidentified Hispanic male admitted Pena into the 5016 Saul Street residence.  *Id.* ¶ 49.

The affidavit then states that "Based on Your Affiant's training, knowledge, and experience your

Affiant believes that Pena went to 5016 Saul Street to obtain the half-ounce of

methamphetamine.  He then returned to 5016 Saul Street to drop off the proceeds of the

methamphetamine delivery."  *Id.* ¶ 50.  The affidavit does not mention Defendant's name.  The

warrant application specifically sought to search 5016 Saul Street, and attached a list of items to

be searched for, including, *inter alia*, controlled substances and drug paraphernalia, the proceeds

of sale of controlled substances, records related to the sale of controlled substances and the

proceeds thereof, and firearms and ammunition.

The warrant was signed by a local district justice at 10:09 p.m. on July 8, 2015, and

specified that the search must occur prior to July 10, 2015 at 10:09 p.m.  On July 9, 2015,

officers searched the residence.  Gov't's Br. at 4.  At the time, Defendant, who was arrested

shortly before the warrant was executed, owned the residence at 5016 Saul Street and lived there

with his girlfriend and their child.  *Id.*

Defendant contends that the facts contained in the affidavit did not provide a substantial

basis for a finding of probable cause.  He argues further against application of the good-faith

exception to the exclusionary rule because the local district justice's reliance on the warrant was

objectively unreasonable.  In support of this argument, Defendant has submitted three pieces of

evidence. The first exhibit is a series of screenshots of a text message conversation between the

CI and Pena spanning July 7-8, 2015, and captured by agents on July 8, 2015 at 7:09 p.m. (the

"Text Messages").  Def.'s Mot. to Suppress Evid. (Def.'s Mot.) Ex. A.  The other two exhibits,

which were referred to in Defendant's motion papers and produced for the Court at oral

argument, are Drug Enforcement Agency (DEA) Reports of Investigation authored by Officer

David Clee on July 9, 2015 (the "July 9 Report") and August 13, 2015 (the "August 13 Report").

The Text Messages begin in the morning of July 7, 2015. The text conversation reveals

that the CI and Pena planned to meet for a transaction at 6 p.m. that day, but the CI suggested to

"change [the] spot." Def.'s Mot. Ex. A at 1-2. Pena ostensibly agreed, but no new location is

included in the text messages. *Id.* The CI later reported his own location as "by bridge n Pratt"

and asked Pena "where u need to b," but Pena replied, "We gota wait main man got in a fender

bender." *Id.* No further messages from Pena appear on July 7, 2015. *Id.* On July 8, 2015, Pena

responded to the CI's attempts to arrange a meeting by asking the CI to call him after work. *Id.*

at 3. At 5:42 p.m., the CI resumed the conversation, and Pena replied with a message asking for

the CI's "order." Oral Arg. Ex. D-1 at 4.[2] The CI replied that he needed "half of glass" and

"probably 62 nd st," and that "hit want to go to but [I don't know] for sure." *Id.* Pena replied, "I

got enough for u only till 2morrow im ready on both how long u gona b." Def.'s Mot. Ex. A at

4. The CI then indicated that he had "the 8 for my homie" (*i.e.*, $800 for the methamphetamine)

but that he had left his money for the crack cocaine in his personal vehicle. *Id.* He then informed

Pena that he was currently "in the work truck u wanna put me 14th st to get me thru the nite n I'll

get u tomorrow or u want me to go pick in up my last drop off is rite here on Adams n tabor." *Id.*

The CI then added "I'll got get it if u want," to which Pena replied, "Yo call me." *Id.* The

message requesting a phone conversation was the final message in the Text Messages submitted

to the Court. *Id.*

In the July 9 Report, Officer Clee stated that the CI informed agents that he had spoken

with Pena just prior to 6:15 p.m., and during this conversation, "Pena advised the [CI] that he

---

[2] One page of screenshots was omitted from Defendant's Exhibit A. This page was included in the version of the screenshots submitted as Exhibit D-1 at oral argument.

had the crack cocaine but was going to get the methamphetamine now and to meet him in 15

minutes near Frankford High School.  The [CI] stated again that he/she knew that Pena's Source

of Supply (SOS) for methamphetamine resided in the area of Wakeling and Saul."  Oral Arg. Ex.

D-2 at 1-2.  The July 9 Report further stated that, after Pena was observed "departing his

residence and proceeding to the area of Saul and Wakeling Streets," surveillance officers

"located Pena's vehicle parked at Saul and Wakeling."  *Id.* at 2.  According to the July 9 Report,

Pena was observed meeting with the CI at Oakland and Harrison Streets, at which point the CI

entered Pena's Dodge Ram and traveled around the block from approximately 6:56 p.m. to 7:01

p.m..  *Id.*  Approximately three minutes after the CI left Pena's vehicle, Pena returned to Saul

Street, "where he was observed by [Police Officer] Marilyn Brown knocking on the door of 5016

Saul Street."  *Id.*  Pena was then admitted into the residence by a male later identified as Nelving

Castro.  *Id.*

The August 13 Report consists of only two paragraphs, the second of which details

Officer Brennan's observations on July 8, 2015.  The August 13 Report states that after

observing Pena's silver Dodge Ram park on the odd numbered side of Saul Street, north of

Wakeling Street, Officer Brennan:

> observed Carlos Pena get out of the vehicle and cross Saul Street toward the even
> numbered side of Saul Street.  Pena then walked into the driveway of 5016 Saul Street.
> [Officer] Brennan then drove past 5016 Saul Street and didn't observe Pena enter any
> residence.  At approximately 6:56 p.m., [Officer] Brennan observed Pena walk out of the
> driveway of 5016 Saul Street, walk across Saul Street, and enter the above described
> pickup truck.

Oral Arg. Ex. D-3 at 1.

## II.    LEGAL STANDARD

The Fourth Amendment to the United States Constitution prohibits "unreasonable

searches and seizures."  U.S. Const. amend. IV.  "Ordinarily, for a seizure to be reasonable under

the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010).  Probable cause exists when, considering the totality of circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  In evaluating a warrant for probable cause, the issuing authority need not determine that evidence is more likely than not to be found, but rather must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

In evaluating the sufficiency of the evidence in support of probable cause, a reviewing court "need not determine whether probable cause actually existed, but only whether there was a substantial basis for finding probable cause." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (internal quotation marks omitted).  In conducting this analysis, courts are confined to "the facts that were before the magistrate judge, i.e., the affidavit, and do not consider information from other portions of the record." *United States v. Miknevich*, 638 F.3d 178, 181-82 (3d Cir. 2011) (internal quotation marks omitted).  Marginal or doubtful cases "should largely be determined by the preference to be accorded to warrants." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

### A.  *Probable Cause in Support of Search Warrant*

Defendant has argued that the affidavit in support of probable cause did not set forth sufficient facts pursuant to the factors set forth in *Unted States v. Burton*, to connect Defendant's residence to a crime.  288 F.3d 91, 104 (3d Cir. 2002) (allowing the search of a suspected drug

dealer's residence based on evidence "(1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the drug dealer's activity").  However, the *Burton* factors are not applicable to this case.  The principles articulated in *Burton* apply when probable cause to search a residence is based on circumstantial evidence connecting the residence to an occupant's illegal activity, but not directly implicating the residence itself.  In other words, the *Burton* factors describe when it is appropriate to infer a link between a resident's illegal activities and his or her residence.  The facts of this case present no need for such an inference because the affidavit directly connects the residence itself to illegal activities.  Thus, the lack of detail about Defendant's own illegal activities and Defendant's connection to the residence in the affidavit does not impact the proffered basis for probable cause, and the factors set out in *Burton* are not relevant for reviewing the adequacy of the affidavit.

Based on the representations in the affidavit, there was a substantial basis to believe that evidence of Pena's distribution of methamphetamine would be found in the 5016 Saul Street residence.  First, surveillance officers observed Pena enter a property on the even-numbered side of Saul Street—believed by the affiant, though not confirmed by observation, to be 5016 Saul Street—immediately before meeting with the CI to carry out the alleged exchange.  Second, surveillance officers directly observed Pena enter 5016 Saul Street shortly after receiving a $800 from the CI allegedly in exchange for 14 grams of methamphetamine.  Finally, the affidavit stated that, prior to initially traveling to Saul Street, Pena told the CI via telephone that Pena did not have the methamphetamine at "home," but would have to pick it up from his "source."  This call reportedly took place while Pena was at the Stouton Street residence, and the only stop officers observed Pena make between the Stouton Street residence and the alleged delivery of

methamphetamine to CI was his visit to a property on the even-numbered side of Saul Street.

Viewing the totality of the circumstances—a phone call indicating that Pena needed to pick up

methamphetamine from his source, a stop on the even-numbered side of Saul Street, an alleged

controlled purchased of methamphetamine and crack cocaine, followed by an observed return to

5016 Saul Street—the affidavit sets forth ample basis to believe that controlled substances and/or

the proceeds of the distribution of controlled substances, as well as records and weapons

associated with the distribution of controlled substances, would be found inside the residence at

5016 Saul Street.  The belief that Pena's stop at 5016 Saul Street was related to obtaining

methamphetamine is made even more reasonable by the CI's statement that his previous

purchases of methamphetamine from Pena had taken place in the same vicinity (as opposed to

the crack cocaine-only controlled purchases that took place in another location).

Adopting the account of July 8, 2015 presented in the affidavit requires crediting the CI's

hearsay statement that Pena said he needed to pick up the methamphetamine from his "source"

prior to delivering it to CI.  In evaluating all of the circumstances surrounding a warrant

application for probable cause, a magistrate must consider "the veracity and the basis of

knowledge of persons supplying hearsay information." *Gates*, 462 U.S. at 238.  Here, there was

ample basis for the local district justice to conclude that the CI's hearsay statements were reliable

and based upon adequate knowledge.  Throughout the CI's collaboration with the agents, the CI

had provided information about Pena's vehicles, place of work, and ability to deliver controlled

substances.  The information was later independently verified by vehicle registration checks and

visual surveillance.  Thus, there was a basis for concluding that the CI was a reliable source of

information concerning Pena.  Furthermore, the CI's specific testimony concerning Pena's need

to pick up methamphetamine on July 8, 2015 was derived from a phone conversation with Pena

10

himself.  In sum, considering all of the circumstances described in the affidavit, including the

reliability and basis of knowledge of the CI's hearsay statements, the affidavit supported a

conclusion that there was a fair probability that the contraband and/or evidence described in the

warrant application would be found at 5016 Saul Street.  Accordingly, the local district justice's

finding of probable cause was consistent with governing law, and the warrant was properly

issued.

### B.  *Good Faith Exception to Exclusionary Rule*

Even when a substantial basis for finding probable cause is lacking, evidence obtained

pursuant to an improperly issued warrant is admissible "when an officer executes a search in

objectively reasonable reliance on a warrant's authority."  *United States v. Williams*, 3 F.3d 69,

74 (3d Cir. 1993).  The good faith in reasonable reliance test examines "'whether a reasonably

well trained officer would have known that the search was illegal despite the magistrate's

authorization.'"  *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999) (quoting *United States v.*

*Leon*, 468 U.S. 897, 922 n.23 (1984)).  While the existence of a warrant typically demonstrates

an officer's good faith, the Third Circuit had identified four situations in which an officer's

reliance upon a warrant would not support the good-faith exception to the exclusionary rule:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or
>     recklessly false affidavit;
> (2) when the magistrate judge abandoned his judicial role and failed to perform his
>     neutral and detached function;
> (3) when the warrant was based on an affidavit so lacking in indicia of probable cause
>     as to render official belief in its existence entirely unreasonable; or
> (4) when the warrant was so facially deficient that it failed to particularize the place
>     to be searched or the things to be seized.

*Hodge*, 246 F.3d at 308.  Defendant argues that the first and third situations are present in this

case.

### 1.  Deliberately or Recklessly False Affidavit

There is a "presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  To mandate an evidentiary hearing concerning an alleged deliberate or recklessly false statement in such an affidavit, a Defendant "must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171). This preliminary showing "cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Id.* at 383 n.8 (quoting *Franks*, 438 U.S. at 171).  The Third Circuit has held that:

> (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*Wilson v. Russo*, 212 F.3d 781, 784 (3d Cir. 2000).

Defendant argues that the Text Messages, the July 9 Report, and the July 13 Report provide evidence that the probable cause affidavit contains false statements concerning Pena's need to obtain methamphetamine from his source, as well as Pena's stop at a property on the even-numbered side of Saul Street prior to meeting with the CI on July 8, 2015.  Specifically, Defendant argues (1) that the Text Messages suggest that the CI, not Pena, suggested moving the July 8, 2015 transaction; (2) that the Text Messages suggest that Pena already had possession of the methamphetamine prior to departing from the Stouton Street residence on that day; and (3) that inconsistencies between the probable cause affidavit and July 9 Report and the July 13 Report suggest that the statement in the affidavit concerning Pena's stop at a house on Saul Street prior to meeting with the CI on July 8, 2015 was false.

As to the first argument, the Text Messages do not indicate that the CI suggested moving the location of the transaction on July 8, 2015, or that the CI ever suggested a specific location to meet with Pena.  Rather, the messages indicate that the CI had suggested changing the meeting location for a transaction on July 7, 2015, which was cancelled after Pena reported that he was involved in a minor car accident.  The meeting was cancelled before a new location was discussed.  When Text Messages resumed on July 8, 2015, the CI merely reported his current location to Pena, and asked if Pena wanted to meet, even though the CI did not have all the funds ready for the crack cocaine.  That inquiry is followed by a message from Pena to "Yo call me." Thus, there is nothing in the Text Messages supporting the interpretation that the CI suggested a meeting location on July 8, 2015.  There is, on the other hand, strong evidence that no meeting place had yet been proposed by either party when, as described in the affidavit, Pena ceased text communication and asked the CI to phone him.

As to whether the Text Messages reveal that Pena claimed to already have the methamphetamine prior to calling the CI, the interpretation of the messages is ambiguous and falls far short of suggesting a material omission or a contradiction with the affidavit.  Defendant points to a message from Pena in which he indicated "im [sic] ready on both."  However, this message was sent shortly before Pena's request for the CI to call him.  While "ready" could mean that Pena was in possession of both drugs, as Defendant argues, it could also mean that Pena had ready access to a source of the drugs, which is consistent with reported contents of the phone call in which Pena indicated via telephone that he already had the crack cocaine, but needed to pick up the methamphetamine from his "source" on the way to the transaction.  Given that the phone call reported by the CI contained a clear and specific account of the status of the

13

drugs, the ambiguous text message falls far short of demonstrating a material contradiction with the affidavit or suggesting that the CI falsely reported the contents of the phone call with Pena.

Finally, the July 9 and August 13 Reports also fail to provide a substantial showing that the affidavit contains false statements.  Defendant has identified two primary discrepancies between the probable cause affidavit and the July 9 Report, neither of which constitutes a material contradiction.  First, Defendant notes that the July 9 Report does not mention Pena walking along the even side of Saul Street or entering a property on Saul Street prior to meeting with the CI.  However, the July 9 Report indicates that Pena's vehicle was observed parked near Saul and Wakeling Street during the specific time frame that the affidavit states Pena was walking along the even-numbered side of Saul Street and entering a property.  Thus, even though the July 9 Report does not specify that Pena was walking along Saul Street during this time period, it does specify that Pena's vehicle was parked in the vicinity of 5016 Saul Street—an observation consistent with the account of Pena's whereabouts in the probable cause affidavit. Second, the July 9 Report lists a different location for the actual meeting between Pena and the CI than was reported in the affidavit.  However, both documents agree that the meeting occurred after Pena re-entered his parked vehicle at Saul and Wakeling and briefly drove to meet the CI, and both documents state that the meeting occurred on Harrison Street near Frankford High School.  The only discrepancy is whether the meeting occurred at the intersection with Wakeling Street or with Oakland Street.  In sum, both the probable cause affidavit and the July 9 Report set forward the same fundamental account:  Pena left 3555 Stouton Street, drove to the area of Wakeling and Saul Streets, parked his car in that vicinity for approximately 20 minutes, returned to his car, and drove to meet the CI on Harrison Street near Frankford High School.  The fact that the July 9 Report does not specify Pena's whereabouts while his car was parked in the vicinity of

14

5016 Saul Street does not, without more, lead to the conclusion that the statements in the affidavit concerning his whereabouts are false.

The August 13 Report also does not provide evidence that the probable cause affidavit contains a false statement.  That report indicates that, prior to meeting with the CI, "Pena walked into the driveway of 5016 Saul Street."  Defendant suggests that this is a revised account of surveillance observations, and thus provides evidence that the observations were misrepresented in the affidavit.  However, this description in the August 13 Report is merely a more detailed version of the statement in the probable cause affidavit that Pena "entered a property" on the even-numbered side of Saul Street.  The fact that the later report, prepared for a different purpose and with the benefit of additional observation and inferences, includes the specific address of the property that Pena entered does not lead to the conclusion that the original statement about Pena entering a property was false.  Rather, it suggests that the original affiant strictly confined the personal observations included in the probable cause affidavit to events that were actually observed, and scrupulously specified which aspects of his affidavit were based on personal observation (*i.e.*, Pena entering a "property") and which were inferences based on experience (*i.e.*, that the "property" was 5016 Saul Street, based on the fact that Pena returned there after the transaction).

In sum, the Text Messages and the Reports of Investigation do not contradict the probable cause affidavit.  Indeed, the Reports of Investigation are consistent with the affidavit's account of Pena's whereabouts, and the Text Messages, along with the July 9 Report, corroborate the affidavit's account of the phone call during which Pena indicated that he would be picking up methamphetamine from a source.  Thus, Defendant has failed to make an offer of

proof with evidence contradicting the affidavit, and he is therefore not entitled to a *Franks*

hearing.

### 2. Affidavit Was Not So Lacking in Indicia of Probable Cause as to Make Reliance Thereon Unreasonable

An officer may not rely on a warrant to authorize a search when the affidavit supporting

the warrant is "so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984).  Such cases include

warrants supported by affidavits containing "mere conclusory assertions or a single piece of

evidence which the law of the stationhouse shop would recognize as clearly insufficient."

*United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993).

Here, even if the affidavit in support of the warrant application did not provide a

substantial basis to find probable cause to search 5016 Saul Street, the affidavit was not so bare

as to render official reliance on the warrant unreasonable.  The affidavit contained surveillance

observations of Pena entering a property on the even-numbered side of Saul Street and returning

to 5016 Saul Street after receiving a large sum of cash from the CI in exchange for

methamphetamine.  This observation occurred in the context of a statement from the CI that Pena

had indicated a need to pick up the methamphetamine immediately before the transaction.  The

CI had provided accurate information in the past, and had already conducted two successful

controlled purchases from Pena.  These facts constitute a more robust foundation of evidence

that the "mere conclusory assertions or a single piece of evidence" that would leave an affidavit

so bare that a reasonable officer would know probable cause was lacking.  Thus, even if the

affidavit failed to establish probable cause, the good faith exception to the exclusionary rule

applies in this case, and evidence seized pursuant to the warrant should not be suppressed.

## IV.    CONCLUSION

The affidavit of probable cause submitted in support of the July 8, 2015 warrant application contained a substantial basis upon which the local district justice could find probable cause to search 5016 Saul Street.  Additionally, Defendant has not made a substantial preliminary showing that the affidavit of probable cause contained false statements, and thus no *Franks* hearing is mandated in this case.  Defendant's motion to suppress shall be denied.

Dated: February 8, 2016

**BY THE COURT:**


**/s/ Wendy Beetlestone**
_____
**WENDY BEETLESTONE, J.**
